Estate of George B. Markle, Sr., deceased.  Appeal of
   S. A. Barber, Guardian of George B. Markle, Jr., and
   E. S. Doud, Guardian of Alvin Markle, Jr., Emily
   Markle, Donald Markle, and Eckley Markle, all minor
   Grandchildren of George B. Markle, Sr.

[Marked to be reported.]

*Decedents' estates—Testamentary trustees—Purchase by trustees at their
own sale under order of court—Will.*

Testator having a large interest in a partnership which mined coal under
leases, appointed by his will his widow and his three sons, with one other
person, his executors and trustees, and directed that the business should be
carried on by them after his death so long as one of his sons, naming
him, who was familiar with the business, should deem it for the best inter-
est of the estate so to do; the trustees to do nothing in connection with the
business except under the advice and in the discretion of that son.  He
also provided that the trustees acting under the advice of the son might
form a new partnership, and he directed that his interest in the partner-
ship might be sold to his sons in different proportions designated.  He
released both the son and the trustees from liability for loss by reason of
their exercising the powers conferred upon them in the manner provided
by the will.  The trustees after taking advice of counsel obtained an order
of the orphans' court authorizing the sale of testator's interest in the part-
nership to the three sons, and to other life tenants under the will.  The
purchasers formed a new partnership, and secured a renewal of the leases
upon terms insisted upon by the lessors, which entailed upon the lessees a
large outlay of money.  No fraud was shown in the sale or in any part
of the transaction.  The property of the firm was appraised conscientiously,
and it appeared that if a sale had not been effected the estate would have
been subjected to a large loss.  Five years after the sale the orphans'
court refused to set aside the sale on the application of the guardians of
certain of the testator's grandchildren.  *Held,* that the decree should be
affirmed.

Argued Jan. 21, 1897.  Appeal, No. 367, Jan. T., 1896, by
S. A. Barber, guardian, et al., from decree of O. C. Phila. Co.,
Oct. T., 1888, No. 190, in dismissing petition to set aside sale.
Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM,
MITCHELL, DEAN and FELL, JJ.  Affirmed.

Petition to set aside sale.

The facts appear by the opinion of the Supreme Court, and by part of the opinion of ASHMAN, J., which was as follows :

The decisive points of this case are few, because the efforts of the petitioners were concentrated upon the showing of malfeasance on the part of the active trustee in depleting the estate of a single asset. That asset, however, was by far the most valuable property left by the testator. The respondent's scheme, it was admitted, was carried out with a scrupulous adherence to legal procedures, and was even perfected by means of a judicial decree; but its purpose was his own enrichment and incidentally that of his co-life tenants, to the total subversion of the rights of remaindermen. The only facts which, at the outset, need to be referred to are that the testator was partner in a firm whose entire source of profit lay in its right, as lessee, to mine coal under two certain leases. The mines gave an extraordinary yield and, recognizing the value of his interest, the testator left minute instructions in his will for the continuance of his estate in the business, either in the existing firm or in one to be established, and he entrusted the work of carrying out this design to his son, John Markle, whom he vested with plenary powers. The son, assuming that the firm had dissolved, entered with his cotrustees and life tenants, as individuals, into a new partnership. Acting under his advice, these parties then applied, as trustees, for leave to sell the testator's interest in the mining improvements and fixtures of the late firm, and to become buyers at the sale ; and in lieu of paying over the purchase money, they obtained the order of court, which is now sought to be vacated, directing that it should be simply charged against their shares in the decedent's estate.

The initial objection to the order of sale is the alleged nonjoinder upon the record of the grandchildren, parties in remainder, of whom two were then living. It is worth noting that the sons and daughters, all of whom appeared, were, as to a part of their interest, something more than life tenants. At the age of forty years, one third of their share of the entire estate was to vest in each of them absolutely. But in case the trustees should decide to continue the business of mining, each of the sons was forthwith to be paid two sixteenths of the value of the lease and improvements of the mining property, and that sum was to be taken in part payment of his interest under the

will.   The effect of this provision was to accelerate the vesting
of so much of the son's shares, or rather to turn what had been
a contingent into a vested estate.   The character of the prop-
erty, outside of the superstructures on the ground, was such
that it was liable to be worked to exhaustion during the pen-
dency of the life estates.   Hence the interests of the grand-
children hinged upon a double contingency; their survival of
the children and the possibility that the principal of the estate
would be absorbed by the income.   For the grandchildren who
were unborn at the date of the decree, and of whom four have
since come into being, no guardian could be appointed.   The
duty of guarding their interests devolved upon the trustees.
It is said, however, that, with one exception, the trustees were
by the very terms of the decree itself antagonistic to those in-
terests, because they were buyers and sellers at their own sale.
But the excepted trustee was wholly impartial; he was a stranger
in blood to the parties, while of his cotrustees two were parents
of the minors who are alleged to have been despoiled of their
inheritance.   He himself petitioned for the sale of the mining
property, and in his capacity as trustee, he represented in that
transaction the remaindermen as fully as he did the tenants for
life.   In fact as well as in law, therefore, the minors were par-
ties to the proceeding.

Impartially read, the evidence points to the conclusion that
the respondent trustee honestly sought the advice of counsel
and withheld from him no fact which would be of service in
making up his opinion.   Not only were the sale and the nego-
tiations which preceded it conducted under legal supervision,
but the scheme of the sale itself was projected by counsel.   It
was said by an eminent judge that he knew of no case where a
man who acted in good faith upon the suggestion of counsel
had not been protected: King v. Morrison, 1 P. & W. 196.   If
we accept this statement in its entirety we do not thereby end
this inquiry.   For the advice of counsel is not so potent a talis-
man that it will render his own errors invulnerable.   It may
shield the trustee from responsibility, but it will not be per-
mitted to inflict loss upon the beneficiaries if the door to a rem-
edy is open.   The present case must be adjudged upon this
theory; because while the complaint is nominally against the
active trustee, it is nevertheless, when analyzed, a criticism of

the course which was recommended by counsel. The work assigned to counsel was rendered difficult and delicate by certain peculiarities in the provisions of the will, and still more in the character of that part of the testator's estate which is now the subject of controversy. At the time of his death, on August 18, 1888, the testator owned an interest of seven sixteenths as partner in the firm of George B. Markle & Co. The partnership was engaged in coal mining, and its most valuable assets were the privileges it enjoyed under two leases, one with the Union Improvement Company and the other with the Highland Coal Company. The testator held this property in high regard · it had engrossed much of his time and energy, and it had not only amply repaid the expenditure, but it promised to be even more remunerative in the future. Hence he was even painfully solicitous in his will to give the most elaborate directions respecting its care and control. After creating a trust under which each of his children would receive an equal share of the income of the estate until his or her age of forty years, and thereafter one third of the principal of such share absolutely, and the income of the remaining two thirds for life, with disposition over to children as the parent should by will appoint, and in default then to children absolutely, the testator directed that his interest in the firm should be continued in the said business for the benefit of his estate; and he empowered his executors and trustees to enter into new leases of the same lands and into new copartnerships. He also declared that all of these acts were to be done only by the advice and in the discretion of his son, John Markle. Under any new agreement of partnership he directed, out of the interest of his estate therein, the transfer to each of his sons, of two sixteenths of the whole value of the lease and improvements, to be charged against them respectively as part payment of their share of the principal of his estate. He constituted his three sons and D. Stuart Robinson his executors and trustees. All of the five children survive, and three of them, the sons, are still under the age of forty years. The trustees continued the business up to January 1, 1890. One of the leases expired on the preceding day, and the other was within two years of expiring. On February 6, 1890, a petition was presented to the orphans' court for leave to sell the interest of the decedent in the partnership to the sons and daughters of the

testator, who had become members of a new firm, and of whom three were trustees under the will. Thereupon a decree reported by a master was entered June 14, 1890, and amended July 5, 1890, authorizing the sale, and fixing as the interests of the purchasers, two sixteenths each to George B., Alvan and John Markle, the sons, and one sixteenth each to Ida and Clora Markle, the daughters, in the purchase money of $289,769.12. The decree further directed that the amounts so due by the sons should be charged against the principal of their several shares in the decedent's estate, and that the amounts due by the daughters should be paid by them in cash.

The specific property covered by the lease with the Union Improvement Company was the Jeddo colliery. The buildings and mining appliances of every description connected with the colliery were owned by the firm, and the land alone was in the ownership of the lessors. The trustees were informed by the lessors that no lease of the Jeddo colliery could be had except in conjunction with the Ebervale colliery, which adjoined the former property. The question which thereupon confronted the trustees was whether the landlord had power to exact that condition, on the one hand, and whether they had the power to comply with it, on the other. The lease provided that, at its termination, the lessees should have "the preference of re-renting the same premises on as favorable terms as shall be offered by other responsible parties, or shall be allowed the actual cash value at that time" of the improvements made by them on or under the land. The phrase, "as favorable terms as shall be offered by other parties," covered a wide latitude of meaning. It certainly comprehended more than the mere bid of a higher rental. Manifestly, more favorable terms would be had from a competitor who should agree, as a condition of leasing this property, to mine another and less desirable colliery than from these lessees, if the latter should refuse, on any terms, to go outside of the land which was described in the original lease. The sole power conferred by the instrument upon the lessees was the right to compel a releasing, provided better terms were not procurable from others. Counsel instructed the trustees that, under the will, they had no authority to accept a renewal of the old or to execute a new lease for any other land than that which the firm had theretofore operated, and that the will in

terms prohibited them from mining in other territory.  We will not discuss the soundness of this opinion, nor decide whether the letter of the will carried such an inhibition, or, if it did, whether the letter might not be disregarded in order to carry out its spirit.  It is sufficient if the course advised by counsel can be vindicated by other considerations.  The Ebervale mine, which was attempted to be foisted upon the trustees, had been overflowed, and could be kept free from water by pumping only, at an enormous and continuing expense.  Another expedient, however, which, if carried out, would be undoubtedly effectual, was to open a tunnel from the mine to Nescopec creek.  The tunnel, it was estimated, would be some three miles in length, and would cost several hundreds of thousands.  When afterwards built by the new copartnership its actual cost was $342,863.44, and the right of way $79,758.82, in addition.  Would the trustees have been justified, no matter with what hope of prospective advantage, in launching the estate upon such an adventure; and would not the parties who now object because the trustees refrained from attempting it have complained more vehemently if they had assumed the risk and wrecked the estate?  It is not enough to say that the undertaking afterwards proved to be feasible, and was successfully carried out by the trustees when they had laid aside their official capacity.  They could do, as individuals, what they might not do as trustees; and their acts and omissions are to be judged, not by the light of experience, but that of experiment.  As far back as the time of Lord Hardwicke, it was held that a trustee deserves to be treated even with tenderness, and the decision in Knight v. Plimouth, 3 Atk. 480, has hardened into a formula which is as stable as any proposition in law, that a trustee shall not be held to a larger measure of vigilance than would be displayed by a man of ordinary prudence in the management of his own affairs.  We think that, with or without the advice of counsel, the trustee had a legal excuse for refusing to make the estate a party to this lease.

Upon the lease with the Highland Coal Company two years were yet to run at the time of the sale.  It contained the same provisions as to renewal which appeared in the Jeddo lease. But it also stipulated that the personnel of the lessees should not be changed without the consent of the lessor. . . .

We have seen that the lessors could successfully oppose any demand for a renewal of the leases; in the one case by insisting upon making the leased territory servient to adjoining mines, and in the other by refusing, after the term should end, to accept the estate of a deceased lessee for the lessee himself. With this inability on the part of the trustees to renew existing leases, or to enter into new leases, of the lands in question, the interest of the testator in those lands, outside of the improvements which he had helped to erect, would vanish into air. The decedent was a partner in a firm whose assets were two mining leases, and whose profits were made by them as lessees and not as owners; when the leases ran out, their profits and the source from which they were derived ceased together.

The reason has already been given why we are not called upon to debate the wisdom of the sale. Nothing short of conspicuous fraud would warrant us, after an interval of years, in going into the minutiæ of the transactions which were necessarily involved in carrying it properly out. We are prepared to say, however, that due regard seems to have been paid to the properties. The appraisers were men of character and ability, and they were able to give a plausible account of the process by which they reached their valuations. Our attention was directed to the apparent discrepancy between the cost of the buildings and fixtures which on the books of the firm was stated at $591,804.45, and their value as fixed by the appraisers, which was $207,752.97 less than the cost. The explanation was that on the books no allowance was made for articles which were worn out or obsolete. When one piece of machinery was replaced by another, the cost of the new was piled upon the cost of the old; and as this practice had continued for years, the aggregate of the figures afforded no possible clue to the market value of what remained in use. One error, however, was pointed out by the appraisers themselves. By a slip of the pen they marked the good-will at $64,000, when they intended $128,000; and seven sixteenths or $28,000 of the former sum, being the proportionate interest of the estate in the firm assets, was carried by the trustees into the inventory, and thence into their account. The amount of the purchase money set out in the decree should be increased $28,000.

Thus far in treating the case we have kept strictly to the

lines which were laid down by counsel, and we have left out of sight what might prove a powerful factor in its determination, the sway which the testator voluntarily commissioned his son to wield. It was a gift, as respects the mining interests at least, and they are all with which we have to deal, of power which was practically absolute, because it was freed from responsibility. " I release my said son from all liability for loss to my estate, occasioned by his deciding what is for the best interests of my estate in the mining of coal or other matter whatever," is the language of the will. It does seem to be futile to undertake to examine through the glasses of an expert the methods of a trustee who holds a patent of authority like this, and to call him to account for what we may even believe to be folly, if it stops short of fraud, when the testator has expressly absolved him from accountability.

This disposes, in a general way, of the testimony and arguments which were submitted concerning the transactions which culminated in the sale. In the decree itself which authorized the sale, a matter is involved which vitally touches the rights of the parties in remainder. The decree authorizing the sale directs that the shares of purchase money due by the sons shall be charged against their respective shares in the principal of the estate. Of course, this does not mean that if the shares, or any of them, in the capital should be less than the amounts due of the purchase money, the deficit shall be presented as a gift to the defaulting purchasers. For example, the share of one of the sons in the gross capital of the estate, as augmented by the purchase money, was, after deducting the third, which was paid to the widow, $93,296.38. But he had been advanced by the testator $102,897.72, so that he is still indebted to the estate, in the shape of advancements, $8,601.34. Evidently his proportion of the purchase money cannot be paid out of an interest which is $8,601.34 less than nothing. No change in the decree, except to add to the amount of purchase money therein, the sum which was omitted by the appraisers, is necessary. The order of sale was based upon the theory that the purchase money was cash, and that the shares of the purchasers in the estate were fully equal in cash values to their shares of the purchase money debt, and it would never have been made upon any other hypothesis. To assume otherwise would be to put this court

in the position of decreeing a positive wrong to the innocent remaindermen. The price at which the property was sold was no mere paper value to figure in a balance sheet or to serve the turn of a speculator; it was the actual sum in cash, less perhaps the value of the good-will, which the lessors were bound to pay if the purchasing trustees had not assumed it; and when the trustees petitioned for leave to pay the purchase money out of their testamentary interests, they pledged their faith that those interests were, at least, equal to the debt. We do not believe that they descended into the artifice of drawing upon a fund which they knew was in the clouds.

The specific prayers for relief are refused; but the order of sale of June 14, 1890, as amended by the supplementary order of July 5, 1890, is corrected by adding $28,000 to the amount of the purchase money, and increasing proportionately the amounts due by the respective purchasers therein. And the trustees are ordered to pay into the capital of the estate so much of the said purchase money as the shares of the children in the said capital are inadequate to pay; such deficit to bear interest from June 14, 1890.

*Error assigned* was in refusing to set aside sale.

*D. L. Rhone* and *J. Q. Creveling*, for appellants.—The sale as made was a legal fraud; it was against public policy, and is voidable at our election: Beeson v. Beeson, 9 Pa. 279; Chorpenning's App., 32 Pa. 315; Tanney v. Tanney, 159 Pa. 277; Davowe v. Fanning, 2 Johns. Ch. Rep. 252; Hampton's Case, 17 S. & R. 144; Lothrop v. Wightman, 41 Pa. 297.

In general terms, "without citation and an opportunity of being heard the judgment of a court, whether ecclesiastical or civil, is absolutely void:" Com. v. Green, 4 Wharton, 568; Richards v. Rote, 68 Pa. 248; Lancaster's App., 111 Pa. 524; Thompson v. Stitt, 56 Pa. 156; Swain v. Fidelity Ins. Co., 54 Pa. 455; Holmes v. Woods, 168 Pa. 530; Lewin on Trusts, *487, Pl. 8; Cadwalader's App., 64 Pa. 293.

A trustee may purchase the estate of his cestui que trust in Pennsylvania at a public judicial sale not instituted by himself: Chorpenning's App., 32 Pa. 315; Beeson v. Beeson, 9 Pa. 279; Baker's App., 120 Pa. 33; Lewin on Trusts, *489,

Pl. 12; Parshall's App., 65 Pa. 224; Fisk v. Sarber, 6 W. & S. 27.

It is said by the court below that the purchase was excusable, because the Jeddo Company refused to make a lease to the firm, with the estate as a member. To which we reply, Not so, on authority of Keech v. Sandford, 1 Leading Cases in Equity, *53 (Wh. and Tudor) Dickson's Notes; Johnson's App., 115 Pa. 129; Fow's Est., 3 Dist. Rep. 316; Stephens v. Black, 77 Pa. 138; Matthews' App., 104 Pa. 444.

The parties composing the new firm are, as they describe themselves, "successors" to the parties composing the old firm who agreed and bound themselves in writing to continue the partnership and to admit the representative of deceased partners as partners in the continuing firm. Such a contract is binding: Parsons on Partnership, sec. 353; Gratz v. Bayard, 11 S. & R. 41; Laughlin v. Lorenz, 48 Pa. 275.

If no improper influences operate on the mind of a trustee to warp his judgment in the exercise of his discretion, and he acts in good faith, a court of equity will not interfere with that discretion. But discretionary powers, like others, must be exercised in the line or spirit prescribed by the trust instrument: Hill on Trustees, 488.

The sale was made for a grossly inadequate price, and under the conditions imposed wholly thwarts the intent of the testator.

The right of the renewal of the leases was an asset: Johnson's App., 115 Pa. 129.

Neither the trustee nor the court has the right to disregard the testamentary command to "sell out," in case of dissolution, unless there be some controlling necessity.

If it be said that the sisters were not trustees, we reply that they made the scheme possible. They were "all in it," and, besides, life tenants have been held as fiduciaries of the remainderman, on the principle already stated that "a community of interest produces a community of duty:" 1 Leading Cas. Eq. *57; Dickson's Notes; Tanney v. Tanney, 159 Pa. 277; Keech v. Sandford, 1 Lead. Cas. Eq. *63.

*Samuel Dickson*, with him *John C. Bullitt*, for John Markle, appellee.

*John G. Johnson*, for Ida M. Hessenbruch, appellee.

*George Tucker Bispham*, for George B. Markle, Alvin Markle and Clora Markle, appellees.

*D. Stuart Robinson*, P. P.

OPINION BY MR. JUSTICE GREEN, Oct. 11, 1897:

It must certainly be conceded that the testator, George B. Markle, Sr., had an absolute and undoubted right to direct the management and disposition of his estate according to the discretion of his son, John Markle. He knew perfectly well the uncertainties and vicissitudes of the coal mining business, the difficulties, the hazards and risks, the extreme alternations of gain and loss which constantly attended its prosecution, and above all he knew the complete, entire dependence, for its successful conduct, upon the skill, the foresight, the sound judgment of the person controlling its operations. Being keenly alive to all these considerations, and knowing by personal experience the qualifications of his son for managing such a business, he clothed him with unusual and extraordinary powers in this respect, subjecting all transactions to the government of his discretion, and binding his executors and trustees by the same limitations. In ordering the business to be carried on after his death he directed that it should be done, " in the discretion of my son John Markle (who is familiar with the said business), so long as he shall deem it for the best interests of my estate," and he then directed him " to do every and all things in the name of the executors and trustees of this my will which by the terms of the present copartnership of George B. Markle & Co. I might or ought to have done until the termination of the said articles of copartnership of George B. Markle & Co., and the lease of the coal property in Luzerne county now operated by George B. Markle & Co." That is to say, that John Markle, his son, should do all acts and things necessary to be done both in the copartnership business, and in the matter of the lease, and he should do these things in the name of the executors and trustees. The same directions were given as to renewing the lease at its expiration, and the articles of copartnership. These things were to be done by the executors

and trustees, but, "acting under the advice and in the discretion of my son John Markle." He also authorized and empowered his executors and trustees, "acting under the advice and in the discretion of my son John Markle to make any new contract or partnership to be known as George B. Markle & Co., for the purpose of mining and shipping coal in Luzerne county, with any person or persons, whom my said executors and trustees, acting under the advice and discretion of my son John Markle, shall see fit," and then authorizing the executors and trustees to bind his estate for any covenants and conditions they may see fit to make, he adds "leaving the sole discretion in case of disagreement between my said executors and trustees as to what is for the best interests of my estate in the formation of said copartnership unto my son John Markle." He then directs that if his son John Markle shall, at the termination of the present leases and copartnership, deem it best to buy out the interest of the other copartners and co-lessees, and take new leases, the executors and trustees shall furnish the money necessary thereto, "for such price as my son John Markle deems proper and fair," and to carry on the business in the same firm name, John Markle to be the superintendent and carry on the business, and, "make all necessary contracts necessary for the proper and best means of mining and shipping coal and the necessary leases of such coal lands." He further directs that if any new agreement is made for carrying on the business his son John shall be the acting trustee, and shall have power to bind the estate for such contracts and engagements as are necessary for the business. He also provides, "if my said executors and trustees shall decide, acting under the advice of my son John Markle, to carry on the business of mining and shipping, either with others or by themselves, of coal in Luzerne county, then it is my will that my said executors and trustees shall transfer, out of my interest or that of my estate in the new business or undertaking, unto each of my sons, George B. Markle Jr., John Markle and Alvan Markle, two sixteenths each, of the whole value of the lease and improvements on said property to be mined, and such transfer to be made at such time as the new undertaking shall be commenced, which said bequests shall be considered as part payment of their share of the principal of my estate, and so charged against them at the val-

uation fixed." Then follows the direction that in the event of a dissolution of the business all the testator's interest in the partnership and in the improvements and machinery shall be sold "for such price and in such manner as my son John Markle shall deem most advisable and best." This is followed by a release of his executors and trustees from all liability by reason of their following the advice of John Markle, and the further release of John Markle in these words, "And I also release my said son from all liability for loss occasioned to my estate, occasioned by his deciding what is for the best interests of my estate in the mining of coal or other matter whatever."

It is almost impossible to conceive of a more full and plenary grant of control and power over a deceased person's estate than is contained in this will. Everything to be done was to be subject to the absolute and unfettered discretion of John Markle, and he was entirely released from all liability for any decision he might make. But ample and complete as these powers were, when a contingency arose which required legal advice and assistance, it was quickly sought and rigidly followed. What was subsequently done in the way of meeting and disposing of the questions which arose, was done under and in pursuance of the advice and direction of most eminent counsel, distinguished alike for his learning and ability as a lawyer, and for his lofty integrity and uprightness as a man. The questions to be met in the emergency when his assistance was sought were of the gravest importance and of the most delicate character. They were carefully studied and considered, and written opinions were furnished by him as to what he considered were the rights and duties of the parties, and the necessary course to be pursued. He advised that the whole matter should be proceeded with under the order and direction of the orphans' court, which was done, and a solemn decree of that court was made directing the sale of the interest of George B. Markle, deceased, in the late firm of George B. Markle & Co., to wit, two sixteenths of said interest to each of the three sons of the deceased and one sixteenth to the two daughters, and that the amounts payable to each of the sons should be charged against their respective shares of the estate, and the amount due by the daughters should be paid in cash. Several objections are made on appeal to the proceedings and decrees made by the orphans' court in 1890.

They are discussed at considerable length in the paper-book of the appellants. We have carefully studied and considered them all in the light of the testimony taken in the court below, and of the various propositions and arguments made in their support. As a matter of course if it had not been for the extraordinary grant of discretion and power to John Markle, for the special directions of the will regarding the entering into a new partnership, the termination of the old one and the termination of the leases and the making of new leases, and for the provision directing the transfer of two sixteenths of the testator's interest to each of his sons, and for the provision authorizing the sale of the testator's interest in the old firm and leases, and in the property of the old firm, there would have been the greatest force in the propositions and arguments advanced by the able counsel for the appellants. But in all these particulars the case is widely and radically different from the ordinary cases of this nature, and the authorities cited fail of application to the facts, the circumstances and the questions appearing on this record. As to the charge of fraud against John Markle it is absolutely unsustained by any testimony in the cause, and we cannot give it a moment's sanction. As to the sale of the testator's interest, it was not only done by the advice of counsel, but under the decree of the orphans' court, with all the facts spread before them, and we are thoroughly convinced that it was wisely and properly done. A sale to strangers at a public auction would have been most unwise upon every consideration, and it would have been most unjust to the parties in interest. A sale to all the children of the testator assured to them all the benefits that could possibly arise from the transaction, and was in no sense injurious to those entitled in remainder. The impracticability of renewing the lease as it was before, on account of the objections of the lessors and the utter impossibility of the trustees undertaking to build the tunnel to drain the Ebervale mine, rendered the formation of a new firm a most urgent necessity. That the children of the testator, being the chief beneficiaries of his will, should have the right to purchase the interest of their father in the old leases and in the firm property, is a self-evident proposition. The property of the firm was appraised conscientiously and fairly by disinterested appraisers, and it cannot for a moment be believed that any larger price could

possibly have been obtained at a public sale. In considering the contention of the appellants upon this subject, it is only necessary to think for a moment of what would have been the result if the opposite course, now suggested, had been adopted. An entire loss of the profits made by the new firm, of which the parents of the appellants were members, an entire loss to the estate of the testator of the interest he formerly possessed in the leases, the business and property of the firm, and only the advantage of a small price, would in all probability have been all that could have been gained by a public sale. We do not consider that the sale made to the children, just as it was, was injurious to the appellants, or that it was in any point of view void for want of legal authority, and we are clearly of opinion that it was within the power of the orphans' court to make the decree, precisely as it was made, for the sale of the testator's interest. The opinion of the learned court below is so full and complete, and sets forth the reasons for sustaining the decree of 1890 with such a force of argument and in such clear and convincing language that we deem it unnecessary to engage in a detailed discussion of the several propositions and contentions advanced for the appellants. Save in a single matter we concur with the opinion in its rulings and conclusions. We do not think that a continuing lien could be imposed upon the share decreed to George B. Markle so as to bind the purchaser from him of that share and require her to pay the whole of the purchase money in cash. That question does not arise upon the present appeal, and it is only mentioned as a qualification of our affirmance.

So far as the present appellants are concerned, the decree of the court below is affirmed, and the appeal dismissed at the cost of the appellants.